**INSURANCE COMPANY OF NORTH AMERICA, Plaintiff,**

v.

**FORTY–EIGHT INSULATIONS, INC., Affiliated FM Insurance Company, Illinois National Insurance Company, Travelers Indemnity of Rhode Island and Liberty Mutual Insurance Company, Defendants.**

Civ. A. No. 7–71654.

United States District Court, E. D. Michigan, S. D.

May 4, 1978.

G. Cameron Buchanan, Buchanan, Ogne & Jinks, P. C., Troy, Mich., Michael R. Gallagher, Thomas E. Betz, Gallagher, Sharp, Fulton, Norman & Mollison, Cleveland, Ohio, for plaintiff.

W. Robert Chandler, Cross, Wrock, Miller & Vieson, Detroit, Mich., William C. Murphy, Richard L. Horwitz, Reid, Ochsenschlager, Murphy & Hupp, Aurora, Ill., for defendant Forty-Eight Insulations, Inc.

Ralph W. Barbier, Jr., Barbier, Goulet, Petersmarck & McFarland, St. Clair Shores, Mich., for defendant Affiliated FM Ins. Co.

David M. Tyler, Tyler, Canham, Goulding, Morad & Warner, P. C., Detroit, Mich., for Illinois National Ins. Co.

Richard J. Tonkin, Vandeveer, Garzia, Tonkin, Kerr & Heaphy, P. C., Detroit, Mich., for Travelers Indemnity of Rhode Island.

Jack H. Erps, Birmingham, Mich., for Liberty Mutual Ins. Co.

## OPINION

FEIKENS, District Judge.

A declaratory judgment is sought by the Insurance Company of North America (INA) against its former insured, Forty-Eight Insulations, Inc. (Forty-Eight), and four (4) other insurance carriers who at some time insured Forty-Eight. These four companies are Affiliated FM Insurance Company (Affiliated FM), Illinois National Insurance Company (Illinois National), The Travelers Indemnity Company of Rhode Island (Travelers), and Liberty Mutual Insurance Company (Liberty Mutual).

This court has jurisdiction of this case by reason of diversity of citizenship of the parties and venue is proper in this district.

The dispute raises questions as to which insurance carrier has a duty to defend and/or to indemnify Forty-Eight for any resultant judgments against it in numerous pending underlying lawsuits. An ancillary

issue is whether or not Forty-Eight must share in the payment of a judgment or in the costs of defense. The plaintiffs in each of those lawsuits, either for themselves or as representatives of decedents, claim to have suffered injury or death from asbestos-caused lung diseases as a result of being exposed to Forty-Eight's products containing asbestos. As of the date of this opinion 251 underlying lawsuits have been filed throughout the United States naming Forty-Eight as a defendant. All these suits also name additional defendants—in some cases as many as twenty (20).

In a typical underlying lawsuit a plaintiff construction worker, employed for many years installing products containing asbestos, sues all of the manufacturers whose asbestos products were used at any of the construction sites at which he was employed. The amount of asbestos dust from each manufacturer's product to which such worker was allegedly exposed or what amount he inhaled during any period of exposure cannot be determined with certainty. The exposures allegedly range in duration from a few years to as long as 48 years.

Under the law of some jurisdictions in which these underlying suits are filed all of the manufacturers may be held jointly and severally liable for an entire damage award. See, Borel v. Fibreboard Paper Products, 493 F.2d 1076 (5th Cir. 1973); Prosser, Law of Torts, § 52 at 315–320 (4th Ed. 1971). In other jurisdictions the defendant manufacturers may have the burden of showing the proper apportionment of damages. Id. In all cases there is the potentiality that any or all of the defendant manufacturers may be held liable for damages.

The dispute between the parties in this case results from their disagreements over the interpretation of the various insurance policies issued to Forty-Eight and concern their respective rights and obligations regarding coverage and the duty to defend. During the past 50 years Forty-Eight has had at least five (5) liability insurance carriers.[1] The controversy as to coverage is whether the coverage at the time of exposure to asbestos or the coverage at the time the disease manifests itself is the relevant coverage. Plaintiff INA and three of the defendant insurance carriers argue for the application of a "manifestation theory" while Forty-Eight and Travelers advocate an "exposure theory."[2]

## I.

The parties have stipulated to most of the facts. In 1934 Forty-Eight, as a subsidiary of an Illinois corporation incorporated in 1923, began selling products containing asbestos. From 1923 through 1970 Forty-Eight or its predecessor manufactured and sold various types of insulation blocks and cements containing asbestos for use on boilers, pipes, fittings, elbows, and flat surfaces. In 1970 it discontinued the use of asbestos in all its products. This fact does not necessarily end the possibility of its asbestos product liability, however, in that demolition or removal of structures containing old insulating materials may cause asbestos to become airborne and may cause injury to persons employed in such activity. Given the latent periods of asbestos-caused lung disease, it is also anticipated that additional actions will be brought against Forty-Eight alleging injury from past exposure.

## A. INSURANCE COVERAGE

INA insured Forty-Eight in various policies from October 31, 1955 through October 31, 1972; Affiliated FM from October 31, 1972 through January 10, 1975; Illinois Na-

---

1. Forty-Eight had additional insurers, but its records of coverage prior to 1955 have been destroyed. For the purposes of this declaratory judgment action it will be considered self-insured prior to that date.

2. The parties entered into an agreement, supplemented by a stipulation in open court be-

tween Liberty Mutual and Forty-Eight to provide a defense for Forty-Eight and to handle the underlying lawsuits during the pendency of this declaratory judgment action, without prejudice to the rights of any party thereto to assert any claim or defense.

tional from January 10, 1975 through January 12, 1976; and Travelers from January 12, 1976 through November 8, 1976. Liberty Mutual became an insurer of Forty-Eight on November 8, 1976 on a $100,000.00 deductible policy currently in force. The following chart shows the dates and coverage limits of the individual policies.

| Policy Name and Number | From | To | One Person One Accident | More Than One Person One Accident | Aggregate |
|---|---|---|---|---|---|
| Ins. Co. of North America | | | | | |
| 9LB21567 | 10/31/55 | 10/31/58 | 100,000 | 300,000 | 300,000 |
| 9LB24403 | 10/31/58 | 10/31/61 | 100,000 | 300,000 | 300,000 |
| LB24688 | 10/31/61 | 6/17/62 | 100,000 | 300,000 | 300,000 |
| LB24688 (End) | 6/18/62 | 10/31/64 | 500,000 | 500,000 | 500,000 |
| LB24913 | 10/31/64 | 10/31/67 | 500,000 | 500,000 | 500,000 |
| ALB25120 | 10/31/67 | 10/31/72 | 500,000 | 500,000 | 500,000 |
| Affiliated FM Insurance Co. | | | | | |
| GLA71255 | 10/31/72 | 1/22/73 | 500,000 | 500,000 | 500,000 |
| GLA71342 | 1/22/73 | 12/31/73 | 500,000 | 500,000 | 500,000 |
| GLA71886 | 12/31/73 | 1/10/75 | 400,000 | 400,000 | 400,000 |
| Illinois National Insurance Co. | | | | | |
| GLA953273 | 1/10/75 | 1/12/76 | 300,000 | 300,000 | 300,000 |
| The Travelers Indemnity Co. of Rhode Island | | | | | |
| 650–862A376–4–TRI–76 | 1/12/76 | 11/8/76 | 500,000 | 500,000 | 500,000 |
| Liberty Mutual Insurance Co. | | | | | |
| LGI–632–004010–126 | 11/08/76 | 1/01/78 | 1,000,000 | 1,000,000 | 1,000,000 |

---

The relevant policy provisions are those that define what is covered, when the coverage applies, and the definitions of the various terms used. These provisions are summarized as follows:

| INSURER | POLICY PERIOD | INSURING AGREEMENT | POLICY PERIOD/ TERRITORY | RELATION TO OTHER INSURANCE | DEFINITIONS |
|---|---|---|---|---|---|
| INA | 10/31/55–10/31/58 | To pay on behalf of insured . . . for damages because of bodily injury . . . caused by accident | This policy applies only to such injuries and damages occurring during the policy period . . . | Excess over other valid and collectible insurance | Bodily injury . . . shall be construed to include sickness, disease . . . |
| INA | 10/31/58–10/31/61 | Same | Same | Same | Same |
| INA | 10/31/61– 6/18/62 | Same | | Same | Same |
| INA | 6/18/62–10/31/64 (endorsement) | To pay on behalf of insured . . . for damages because of bodily injury . . . caused by occurrence | Same | Same | Bodily injury . . . shall be construed to include sickness, disease . . . Occurrence means either an accident happening during the policy period or a continuous or repeated exposure which . . . causes injury during the policy period |

| INSURER | POLICY PERIOD | INSURING AGREEMENT | POLICY PERIOD/ TERRITORY | RELATION TO OTHER INSURANCE | DEFINITIONS |
|---|---|---|---|---|---|
| INA | 10/31/64–10/31/67 | To pay on behalf of insured . . . as damages because of bodily injury | This policy applies only to occurrences which take place during the policy period | Excess over other collectible insurance with any other insurer | Bodily injury means bodily injury, sickness, disease . . .<br><br>As respects property damage liability, occurrence means either an accident happening during the policy period or a continuous or repeated exposure to conditions which unexpectly and unintentionally causes injury to or destruction of property during the policy period |
| INA | 10/31/67–10/31/70 (renewal through 10/31/72) | To pay on behalf of insured . . . as damages because of bodily injury . . . caused by an occurrence | This policy applies only to bodily injury . . . which occurs during the policy period | Primary; contains formula where other insurance applies on same basis . . . | Bodily injury means bodily injury, sickness or disease . .<br><br>As respects property damage liability occurrence means an accident, including injurious exposure to conditions, which results, during the policy period, in property damage neither expected nor intended from the standpoint of the insured |
| Affiliated | 10/31/72– 1/22/73 | Will pay on liability of insured . . . as damages because of bodily injury . . . caused by an occurrence | This policy applies only to bodily injury . . . which occurs during the policy period . . . | Same | Bodily injury means bodily injury, sickness or disease . . .<br><br>Occurrence means an accident, including injurious exposure to conditions, which results during the policy period in bodily injury neither expected nor intended from the standpoint of the insured |
| Affiliated | 1/23/73–12/31/73 | Will pay on behalf of the insured . . . as damages because of bodily injury . . . caused by an occurrence | This policy applies only to bodily injury . . . which occurs within the policy territory | Same | Bodily injury means bodily injury, sicknes or disease, which occurs during the policy period . . .<br><br>Occurrence means an accident, including continuous or repeated exposure to conditions which results in bodily injury . . . |
| Affiliated | 12/31/73–1/10/75 | Will pay on behalf of the insured . . . as damages because of bodily injury . . . caused by an occurrence | This policy applies only to bodily injury . . . which occurs within the policy territory | Same | Definition of bodily injury same as above<br><br>Definition of occurrence same as above |

| INSURER | POLICY PERIOD | INSURING AGREEMENT | POLICY PERIOD/ TERRITORY | RELATION TO OTHER INSURANCE | DEFINITIONS |
|---|---|---|---|---|---|
| Illinois | 1/10/75–1/12/76 | Same | Same | Same | Definition of bodily injury same as above<br><br>Definition of occurrence same as above |
| Travelers | 1/12/76–11/8/76 | Same | This policy applies during the policy period as described in such sections | Same | Definition of bodily injury same as above<br><br>Definition of occurrence same as above |
| Liberty Mutual | 11/8/76– | Same | This policy applies only to bodily injury . . . which occurs within the policy territory | Same | Definition of bodily injury same as above<br><br>Definition of occurrence same as above |

On June 27, 1977, INA advised Forty-Eight that INA disclaimed any duty to defend or indemnify Forty-Eight under its various policies issued to Forty-Eight with respect to any lawsuits alleging asbestos-caused injury or death, as well as to any such lawsuits filed after June 27, 1977 in which a complaint alleged that the disease manifested itself after October 31, 1972, the date INA's final policy expired. Suit was thereupon filed by INA in the Northern District of Ohio and in this district. The Ohio action was adjourned pending the outcome of this declaratory judgment action. Forty-Eight has counterclaimed for declaratory judgment.

## B. MEDICAL EVIDENCE

The medical testimony of Dr. Forde A. McIver introduced at trial and the depositions of Dr. Henry Anderson and Dr. George Wright admitted into evidence deal with asbestos-caused lung diseases in detail and are in substantial agreement on all points that are relevant to the issues. Asbestos-caused lung diseases alleged in the underlying complaints and described as asbestosis, mesothelioma or bronchogenic carcinoma (also known as lung cancer) can be divided into malignant and non-malignant varieties.

Asbestosis is a non-malignant disease resulting from the inhalation of asbestos fibers of a certain length over a considerable period of time causing a bodily reaction that may eventually impair the function of the lungs. The body has several defense mechanisms that exclude from the functional areas of the lungs most of the foreign matter inhaled. It also has a mechanism for removing such matter that passes these defenses. Asbestos fibers of a certain length, however, cannot be removed and become embedded in the lung tissue in the areas where the alveoli are found and where the transfer of gases in and out of the blood takes place. Being unable to remove these minute particles of foreign matter, the body copes by walling off the particles. The walling off is done by a proliferation of fibrous cells that eventually produce a dense scar-like material in the functional area of the lungs. This process takes about six (6) months and is irreversible. Each repetition of inhalation and reaction adds a tiny deposit of scar-like tissue in this critical area.

The accumulation of scar-like tissue decreases the functional volume of the lungs, stiffens the passage ways, and impedes the transfer of gases in and out of the blood. If the process continues, the functional capacity of the lungs becomes inadequate to

support normal activities and may eventually be unable to support life.

Asbestosis progresses slowly as a disease. Damage begins with the initial insult, and scar-like tissue builds up over many years before symptoms become noticeable or a diagnosis can be made. In the majority of cases symptoms do not appear until more than twenty (20) years after initial exposure. The intensity and duration of each insult as well as the frequency of repetition combine with numerous individual characteristics to determine which persons who are exposed sustain noticeable lung damage, when functional impairment becomes noticeable, and what symptoms such a person finally demonstrates. Even if after a period of exposure, no additional asbestos fibers are inhaled, tissue change may nonetheless continue and be unnoticed for decades. Since the effects of tissue changes are cumulative, an exposed person's condition is the product of an unknowable sequence of insults arranged randomly or in groups along a continuum that stretches from as long as 50 years to less than six months prior to manifestation. Additional factors such as variations in ventilation, moisture in the air, and an exposed person's health at the time of any exposure combine to make it impossible to determine which exposure to asbestos caused injury or to determine when such a person becomes "diseased." [3]

A second asbestos-caused disease, mesothelioma, is a malignant condition of cells lining the chest wall resulting in a tumor. This disease is rare except in persons who have been exposed to asbestos. The relationship between asbestos and mesothelioma is not well understood, and relatively small exposures over a period of a few years have been associated with this condition. The growth of a tumor generally follows a latent period of over 20 years during which there need not be any additional exposure. Diagnosis is possible within a short time of the beginning of tumor growth. Death follows diagnosis by less than two years in most cases. As with asbestosis it is virtually impossible to determine which exposure or exposures to asbestos cause the disease.

Bronchogenic carcinoma (lung cancer) is another malignant disease that has been associated with asbestos, at least in persons who smoke cigarettes. It also has a latent period following inhalation averaging approximately 15 to 20 years. It also progresses slowly, but can and often is diagnosed within a few years of its initial appearance.

## II.

### A. APPLICABLE LAW

In a contract diversity action such as this, Michigan conflict of law rules require the application of the law of the place where the insurance policies were issued and countersigned. *Chrysler Corp. v. Insurance Co. of North America,* 328 F.Supp. 445 (E.D.Mich.1971). The parties agree that Illinois law applies to the interpretation of all the policies except the Liberty Mutual policies, which are governed by New Jersey law. The law of both states holds that where the terms of an insurance contract are clear and unambiguous, they must be given their common and ordinary meaning. See *Canadian Radium & Uranium Corp. v. Indemnity Insurance Company of North America,* 411 Ill. 325, 104 N.E.2d 250 (1952); *Boswell v. Travelers Indemnity Co.,* 38 N.J. Super. 599, 120 A.2d 250 (1956); *Wilkinson & Son, Inc. v. Providence Washington Ins. Co.,* 124 N.J.Super. 466, 307 A.2d 639 (1973). In both states insurance contracts are to be liberally construed in favor of the insured and against the insurer. *J. L. Simmons Co. v. Fidelity and Casualty Co.,* 511 F.2d 87 (6th Cir. 1975) (applying Ill. law); *Last v. West American Co.,* 139 N.J.Super. 456, 354 A.2d 364 (N.J.1976). If there are ambiguities in the policy, or uncertainty over its

---

**3.** For a discussion of asbestosis and its effects on the body see Selikoff, Bader, Bader, Churg, and Hammond, "Asbestosis and Neoplasis," 42 Am.J.Med. 487 (1967); Selikoff, Churg, and Hammond, "The Occurrence of Asbestosis Among Insulation Workers," 132 Ann.New York Acad.Sc. 139 (1965).

interpretation, the policy is to be construed against the insurer, and in favor of the insured. *Tiffany Decorating Co. v. General Accounts Fire and Life,* 12 Ill.App.3d 597, 299 N.E.2d 378 (1973); *Bryan Construction Co. v. Employer's Surplus Lines Ins. Co.,* 60 N.J. 375, 290 A.2d 138 (N.J.1972). See also *Corbett Co. v. Ins. Co. of North America,* 43 Ill.App.3d 624, 2 Ill.Dec. 148, 357 N.E.2d 125 (1976).

## B. POLICY LANGUAGE AND THEORIES OF INTERPRETATION

In each policy the insurer has agreed to pay on behalf of the insured such damages as are determined because of "bodily injury" caused by an "occurrence" during the policy period. "Bodily injury" *includes* injury, sickness and disease. "Occurrence" includes a continuous or repeated exposure to conditions which result in bodily injury. INA, Affiliated FM, Illinois National, and Liberty Mutual contend that in lawsuits alleging asbestosis, mesothelioma, or lung cancer, coverage is provided by Forty-Eight's insurer at the time such a plaintiff's disease manifests itself, that is, the date on which the condition became known or should have become known to plaintiff or the date on which plaintiff's condition was medically diagnosed, whichever comes first. Relying heavily on statute of limitations and health insurance cases, these insurers argue that though there is tissue damage long before manifestation, a person cannot be considered injured or diseased until symptoms are noticeable or a diagnosis is made. They point out that an exposure may or may not result in lung damage; that only some persons who are exposed to asbestos dust inhale it; that only some of those who inhale it experience tissue change; and, that the level of tissue change only reaches the point of functional impairment in some of those who undergo such tissue change. Thus, they argue, exposure is not necessarily related to injury, and it is reasonable to say that injury or disease does not "occur" until functional impairment is noticeable.

They cite medical evidence to substantiate the contention that it is impossible to determine with any degree of certainty: (a) the correlation between the onset or progression of the disease with specific incidents of exposure; (b) the extent of damage at any particular date as the disease develops; or (c) the time at which bodily function begins to be impaired. They claim that the manifestation theory provides the only certain method of establishing coverage and advocate its adoption as a "rule of reason." *See, General Dynamics Corp. v. Benefits Review Board, et al.,* 565 F.2d 208 (2d Cir. 1977).

Forty-Eight and Travelers, on the other hand, contend that manifestation is unrelated to injury. They maintain that these liability policies are "occurrence" or "accident" policies, not "discovery" or "claims made" policies. It is their position that I would drastically reform the terms of the relevant insurance contracts if I adopt the manifestation theory. They point out that the uncontroverted medical evidence indicates that tissue damage occurs shortly after inhalation and as far back as 50 years before manifestation. They cite medical evidence to show that asbestos-caused diseases involve cumulative minute injuries and are progressive. They characterize this chain of events as a "continuing tort" and claim that this makes all insurers on the risk from the time of alleged initial exposure through manifestation jointly and severally obligated to defend and to indemnify Forty-Eight if liability is found.

Following the decision in *Borel, supra,* holding all manufacturers of asbestos products to which a claimant was exposed jointly and severally liable, some insurers began to espouse the manifestation theory for coverage determination while others continued to advocate the exposure theory. Discussions and meetings have heightened the controversy and its continued existence is demonstrated by the fact that there are insurers on both sides of the issue in this declaratory judgment action. Forty-Eight has introduced numerous items of correspondence and other documents to show that even within certain insurance compa-

nies' practices and positions relative to this coverage controversy have changed over time.

In the three years prior to INA's letter of June 27, 1977, Forty-Eight tendered the defense of approximately 150 lawsuits to INA and the other carriers involved in this action. In every instance a defense was provided—usually by INA—without a reservation of rights raising the point that manifestation of the disease must occur during the coverage period as a requirement for coverage. There is evidence that demonstrates that INA sought contribution and litigation expense arrangements with other insurers using periods of *exposure* as the determining factor. In some of the suits defended by INA without objection or reservation the manifestation date of a plaintiff's disease came after the expiration of INA's coverage. In all cases there is exposure alleged during INA's policy periods. Illinois National and Affiliated FM also each declined coverage in specific cases on grounds that the dates of *exposure* alleged in the complaint were outside the coverage period of their respective policies.

■ I accordingly conclude that the conduct and correspondence of some of the insurers in this case are instructive on the issue of interpretation of the policies involved. *Brooklyn Life Ins. Co. v. Dutcher,* 95 U.S. 410, 24 L.Ed. 410 (1877); *Weger v. Robinson Nash Motor Co.,* 340 Ill. 81, 172 N.E. 7 (1930). The meaning the parties themselves attach to the terms of the contract can be inferred from their conduct. *Philips Electronics v. Leavens,* 421 F.2d 39 (3d Cir. 1970). From such conduct it would appear that the manifestation theory appears to be a new approach and that it was this that precipitated litigation quite soon after it was put into practice by the insurers who now advocate its adoption.

## C. LEGAL IMPLICATIONS OF THE EVIDENCE

■ Beyond this implicit approval of the exposure theory as the correct interpreta-

tion by three of the four carriers who now oppose it, there are several other factors that compel adoption of the exposure theory of coverage. The medical evidence establishes that each tiny deposit of scar-like tissue causes injury to a lung. Each such insult causing injury is an "occurrence" for the purpose of determining which coverage applies. (This must be distinguished from any test that may be used to determine when an applicable statute of limitations begins to run in the underlying lawsuits.) This occurrence takes place within a short time after inhalation in any instance where exposure results in tissue change. It is irrelevant that not all persons who are exposed experience tissue damage; it is clear that, when a lawsuit is brought by a person who alleges an asbestos-caused lung disease, there is a strong likelihood that proof is available as to inhalation and tissue change. Each minute injury may then be a part of a "continuing tort," *Karjala v. Johns-Manville,* 523 F.2d 155 (8th Cir. 1975), and may constitute a separate occurrence. Consequently, each insurer on the risk when a currently diseased plaintiff was allegedly exposed is obligated to acknowledge coverage and to provide a defense and possibly indemnification.

■ To obtain a judgment against Forty-Eight, a plaintiff in an underlying lawsuit must show exposure to Forty-Eight's asbestos products. A similar showing must be made in the underlying lawsuit as to other defendant asbestos manufacturers who, it is claimed, are involved. Having shown such exposure to the products of asbestos manufacturers and the existence of disease, such a plaintiff has made out a prima facie case of injury. Such a plaintiff's inability to fix the exact time when each injury occurred does not preclude liability in a case where such injuries are cumulative and progressive, and cannot be apportioned between given points or periods of time. *Borel, supra,* at 1094.[4]

---

4. See also, Prosser, *Law of Torts,* (4 Ed. 1971), pp. 313–323, regarding apportionment of damages; Nachman, "The New Policy Provisions for General Liability Insurance," 18 The Annals, No. 3, p. 197 (Fall, 1965).

By analogy, each insurer of each manufacturer has coverage for the injuries allegedly caused by that manufacturer. By being on the risk during an indivisible injurious process, each insurer is rendered jointly and severally liable to defend and indemnify its insured.[5]

Any other theory of coverage would render Forty-Eight's insurance illusory. Under *Borel* and similar cases Forty-Eight may be held liable for asbestos-caused injuries occurring during the period from 1923 until 1970 when it discontinued the sale of asbestos products. If the manifestation theory is adopted, Forty-Eight would be effectively deprived of coverage it paid for and might be unable to secure coverage for liability in future cases where manifestation occurs after coverage is not available. Joint and several liability of the insurers who insured Forty-Eight at various times during the injury producing process (which I equate with exposure) is the necessary analogue of Forty-Eight's potential joint and several liability to each plaintiff in the underlying lawsuits.

## D. CONCLUSIONS OF LAW

■ Cases dealing with statute of limitation issues are not applicable to this coverage problem. *See, Tijsseling v. General Accident, Fire & Life Assurance Corp., Ltd.,* 55 Cal.App.3d 623, 127 Cal.Rptr. 681 (1976). Statute of limitation cases are based on public policy considerations which balance the prejudice to a defendant caused by stale claims when weighed against considerations of fairness to a plaintiff. So considered, it is at the time an asbestos-caused disease manifests itself in a way that implicates a causal relationship to the manufactured product that the public interest in limiting the time for asserting a claim attaches, and it is then that the statute of limitations begins to run. *Karjala, supra; Urie v. Thompson,* 337 U.S. 163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949). Because of this, courts often speak of the "injury" having "occurred" at that time as a way of determining when a cause of action accrues. Discovery is a necessary requirement for a fair rule in limitations of actions cases, but, from an insurance coverage perspective, it is the injury and not its discovery that subjects a manufacturer to liability and consequently its insurer to a duty to defend and to indemnify. The alleged injury in the underlying lawsuits is the formation of scar-like tissue because of the implanting of asbestos fibers in the lungs. If this injury causes a plaintiff to suffer damages, the insurer who was on the risk at the time that that injury occurred has the relevant coverage.

■ INA has cited *General Dynamics, supra,* and its predecessor, *Travelers Ins. Co. v. Cardillo,* 225 F.2d 137 (2d Cir. 1955), *cert. denied,* 350 U.S. 913, 76 S.Ct. 196, 100 L.Ed. 800 (1955) as explicit support for its position that the date of manifestation of disease should control coverage. Both these cases deal with workmen's compensation awards under the Longshoremen's and Harbor Worker's Compensation Act and apply

---

Note also the reference to injurious exposure to conditions which results in injury. This eliminates any requirement that the injury result from a sudden event. Although it is most common that the injury takes place simultaneously with the exposure, there are many instances of injuries taking place over an extended period of time before they become evident. For example, slow ingestion of foreign substances of inhalation of noxious fumes. In cases such as these, the definition of occurrence serves to identify the time of loss for the purpose of applying coverage—the injury must take place during the policy period.

In some exposure types of cases involving cumulative injuries, it is possible that more than one policy will afford coverage. Under these circumstances, each policy will afford coverage to the bodily injury or property damage which occurs during the policy period.

Elliott, New Comprehensive General Liability Policy, Liability Insurance Disputes Litigation Series, Practicing Law Institute, 12–3, 12–5 (1968). *Accord,* Long, Law of Liability Insurance, § 11.05A.

5. For an analogous situation involving property damage that resulted from a process of dry rot following defective construction, *see Groul Construction v. Insurance Company of North America,* 11 Wash.App. 632, 524 P.2d 427 (1974).

the "last insurer" of the "liable employer" rule of coverage. They are clearly distinguishable in that Congress altered the common law to further a statutory compensation scheme. This and similar state workmen's compensation schemes that establish a "last employer" or "last exposure" rule for occupational disease cases are explicitly in derogation of the common law of contracts. Such common law principles are nonetheless still applicable in this case. The courts in *General Dynamics* and *Cardillo* concluded as they did because they held that the determination by Congress as to how the equities should be balanced in arriving at a comprehensive compensation scheme had to be followed. In this case I am bound to apply the contract laws of Illinois and New Jersey, and I am not permitted to determine public policy which may be in derogation of the common and statutory law of those states. If such is to be done, it must be done through legislative action.

There is no support in the insurance policies in this case for the contention that bodily injury must manifest itself during the policy period to invoke coverage. Such a requirement could have easily been drafted within the definition of "occurrence"—assuming that such a restriction would not be contrary to public policy. *Stauffer Chemical Co. v. Ins. Co. of North America,* 372 F.Supp. 1303 (S.D.N.Y.1973) concerned an "occurrence" policy. Stauffer manufactured a product that was intended to protect potato seedpieces against "seed rot" and "damp off." It was shown that the product was not effective in so doing. INA denied coverage on the ground that the policy did not apply to liability which arose out of the ineffectiveness or failure of the product to perform as represented. INA said that there was no occurrence within the meaning of the policy because the conditions that caused injury were not Stauffer's product—it was rather the failure to prevent such conditions that caused injury. The court rejected this interpretation:

> However, it was not made a condition of coverage with respect to the definition of occurrence in the instant policy that

the condition causing the injury be created by the insured, and the court may not inject a clause into the policy or make a new contract for the protection of the insurer. *Id.* at 1306.

*Stauffer* provides guidance in the matter of construction of insurance contracts, but it also meets INA's contention in this case that any given exposure cannot be an occurrence because it did not cause the worker to become diseased, that it merely made such a disease possible when the effects of additional exposures were added to it.

The proponents of the manifestation of disease theory cite case law holding that the time when the injury or damage occurs and not the time when the negligent act occurs determines insurance coverage. *See, e. g., Peerless Ins. Co. v. Clough,* 105 N.H. 76, 193 A.2d 444 (1964); *Remmer v. Glen Falls Indemnity Co.,* 140 Cal.App.2d 84, 295 P.2d 19 (1956); Annotation 57 ALR2d 1385. They argue that there is an implicit analogy between the negligence-injury sequence in those cases and the exposure-disease (severe enough to manifest itself) sequence alleged in the underlying lawsuits. This analogy is rejected. The negligent acts alleged in the underlying lawsuits occurred when the products were sold without sufficient warning, not when the plaintiffs were exposed. The medical evidence in this case indicates clearly that injury to lung tissue occurs soon after exposure, not when the disease manifests itself.

Two recent United States District Court cases deal with occurrence policies in this context. In *Porter v. American Optical,* Civil Action No. 75–2202 (E.D.La., entered November 23, 1977) (cited by INA) an asbestos worker who was diagnosed as having asbestosis, sued the manufacturer of a respirator alleging that his disease was caused by defects in the apparatus as well as defendant's failure to warn him of the danger involved in its use. Following a jury verdict and based on some of the evidence adduced at trial the court found that the insurer on the risk at the time of manifestation had to afford coverage even

though another insurer also had an occurrence policy and had been on the risk throughout much of the period during which the plaintiff was exposed to asbestos. The court equated "bodily injury" with "sickness or disease sustained by any person," and found that the manifestation of the disease was the occurrence that triggered coverage. Such a construction is not warranted here. While the definition of bodily injury *includes* sickness or disease in the policies before me, the definition also specifically includes injury to the body within its terms. Because of the extensive medical testimony that tissue injury is sustained long before a worker can be termed diseased, the plain meaning of the term "bodily injury" requires coverage at the time of the insult of asbestos that follows upon exposure. *Porter* is also distinguishable in that it deals with coverage of the liability of a manufacturer of a respirator, not a manufacturer of asbestos products. The liability of a manufacturer of a product designed to prevent injury from an inhaled substance may be materially different from the liability of the manufacturer of the deleterious substance inhaled.

The second case is *Tenneco Chemicals v. Employers Mutual Liability Ins. Co.*, 76 Civ. 809 (S.D.N.Y., filed April 8, 1977) (cited by Forty-Eight). In the underlying lawsuit to that case, the plaintiff had been injected with a radioactive drug for testing purposes. The drug was defective in that it underwent atomic decay, breaking down into new elements and emitting harmful radiation during a 23-year period while lodged in plaintiff's body. Employers Mutual Liability Insurance Company was on the risk as an insurer for an eight-year period from two years after the injection until ten years after the injection. The policy provisions are the same as those before me in this case. The court there held that occurrence coverage is perhaps the

broadest possible coverage and that injury caused by the drug was sustained during Employers' coverage period. This injury was held to be an occurrence for the purpose of determining coverage even though the condition of the plaintiff in the underlying lawsuit was not diagnosed until more than eleven years after the policy expired. *Tenneco Chemicals* is solid support for my holding.

### III.

### IMPLICATIONS OF THE ADOPTION OF EXPOSURE THEORY

The language of the various policies, the medical evidence as to bodily injury, and the reality of joint and several liability in the underlying lawsuits combine to mandate the adoption of the exposure theory of coverage. This conclusion, however, leaves several questions unanswered. How is the duty to indemnify to be apportioned? What is the liability of Forty-Eight in its self-insured status? How is "stacking" of policy limits to be avoided?

 In underlying cases in which Forty-Eight is held liable, it will in all likelihood be held jointly and severally liable with other manufacturers for all damages caused by an indivisible injury.[6] This may ultimately result in an equal sharing of the payment of the judgment or in some negotiated formula for payment by each manufacturer found liable. Since each insurer covered Forty-Eight for differing periods of time, the obligation to indemnify should be apportioned on the basis of the relative lengths of their respective coverage periods.

As explained in footnote 5, *supra*, the indivisible and cumulative nature of the injuries and the possibility of a joint and several judgment may render Forty-Eight liable for all damages caused by an injury, some portion of which was caused by expo-

---

6. In the event that special questions to the jury or the post-trial certification of the judge establishes the dates of exposure to the products of each manufacturer, the judgment could be apportioned on the basis of the relative lengths of the periods of exposure.

It should be noted that this opinion deals only with insurance coverage and does not in any way address or establish what the liability of Forty-Eight may be in any underlying lawsuit.

sure to asbestos occurring *after* 1970 when Forty-Eight stopped manufacturing asbestos products. It is also possible that Forty-Eight may be held liable for all of the damages caused by an injury, some portion of which was caused by exposure to asbestos products of other manufacturers *before* a plaintiff was exposed to Forty-Eight's products. This application of the doctrine of joint and several liability, in addition to providing a remedy when the cause or time of the injury cannot be determined precisely, is appropriate because the medical evidence shows that all insults to lung tissue from asbestos combine to cause functional impairment. Insults occurring before and/or after exposure to Forty-Eight's products would not cause the same injury if it were not for the insults that resulted from exposure to those products.

Since part of the injurious process for which Forty-Eight may be held liable in an underlying lawsuit may occur before 1955, or at some time in the future when it is uninsured, it must bear a part of such judgment in the same proportion as the periods during which it had no coverage bear to the total period of proved exposure. This does not render Forty-Eight's coverage illusory; the insurers have a duty to indemnify Forty-Eight for judgment liability for the injuries that are apportioned for the periods of their respective coverages, while Forty-Eight must bear judgment liability for injuries apportioned to the period when it had/has no coverage.[7]

The table of coverage, *supra*, shows that different individual policies were in effect for varying lengths of time and had differing limits of liability. It might be argued that since an injury occurs each time an asbestos fiber insults the tissue of a lung, the policy limits for each policy period could be "stacked" to produce a coverage liability in any given case that would be many times the aggregate limit of any one policy. Forth-Eight has stated on the record that it does not seek to stack coverages in this way. In any event, no insurer should be held liable in any one case to indemnify Forty-Eight for judgment liability for more than the highest single yearly limit in a policy that existed during the period of the claimant's exposure for which judgment was obtained.

Various aspects of these questions may arise. Insurers will be able to resolve many, if not all, of these questions since they possess great skills in the compromise and settlement of disputes.

### IV.

### THE DUTY TO DEFEND

The duty to defend requires additional comment in that it is distinguishable from and in some ways broader than the duty to indemnify. *Sprayregen v. American Indemnity Co.*, 105 Ill.App.2d 318, 245 N.E.2d 556 (1969); *McFadyen v. North River Insurance Co.*, 62 Ill.App.2d 164, 209 N.E.2d 833 (1965). Each of the relevant policies contains a provision that the insurer will defend any suit against its insured that alleges injury, sickness, or disease and seeks damages on account thereof even if such suits are groundless, false or fraudulent. None of the policies contains language that makes manifestation a factor in determining whether or not there is a duty to defend.

---

7. A hypothetical case may clarify this point. Assume, in addition to the facts as to coverage in this case, that Forty-Eight has liability coverage for asbestos-related injuries through 1979, but not thereafter. Assume further an award through a joint and several judgment to a plaintiff who was found to have been exposed to asbestos dust from January 1, 1945 to December 31, 1984. Also, assume that the proofs show that the plaintiff was exposed to the asbestos products of manufacturers X and Y from 1945 to 1950, to the products of Forty-Eight, and manufacturers X, Y, and Z from 1950 to 1970, and to the products of manufacturers Y, Z, and A from 1970 through 1985. Each insurer would be obligated to indemnify Forty-Eight for $\frac{1}{40}$th of the judgment for each year that it was on the risk. Since Forty-Eight was self-insured or uninsured during portions of this period it would likewise be obligated to pay a portion of the judgment for each year of exposure during which it had no coverage—in this example $\frac{15}{40}$ths.

In *Maryland Casualty Co. v. Peppers*, 64 Ill.2d 187, 355 N.E.2d 24 (1976), the Illinois Supreme Court said:

> In determining whether the insurer owes a duty to the insured to defend an action brought against him, it is the general rule that the allegations of the complaint determine the duty. If the complaint alleges facts within the coverage of the policy or potentially within the coverage of the policy the duty to defend has been established. (Citations omitted).
>
> This duty to defend extends to cases where the complaint alleges several causes of action or theories of recovery against an insured, one of which is within the coverage of a policy while the others may not be. (Citations omitted). 64 Ill.2d at 193–195, 355 N.E.2d at 28.

New Jersey law is to the same effect. *See, Burd v. Sussex Mutual Ins. Co.*, 56 N.J. 383, 267 A.2d 7 (1970).

The cumulative and indivisible nature of the injuries alleged in an underlying lawsuit may result in a judgment holding Forty-Eight jointly and severally liable for all of a plaintiff's damages. The cumulative and indivisible nature of the injuries also makes it impossible to determine when any given portion of such injuries occurred. Consequently, the resulting judgment relates to the entire period of exposure and must be apportioned by the length of each insurer's coverage. Query whether it necessarily follows that the duty to defend or bear the cost of defense should also be apportioned in this way. The public policies behind such an apportionment of the duty to indemnify do not exist with the same force as to the duty to defend. It might be contended that the insurer on the risk at the time the suit is brought, or the manufacturer if it is uninsured at the time the suit is brought, should assume all of the responsibilities and costs of defense. This might, however, result in unequal treatment of the various insurers. What is

more, the defense of lawsuits that arise out of injuries caused during a policy period is one of the benefits Forty-Eight paid premiums for and is entitled to receive.

■ The apportionment of the duty to indemnify should be accompanied by a similar apportionment of the costs of defense. These costs must also be apportioned over the entire period during which the alleged injuries occurred to reflect the cumulative and indivisible nature of the process that gave rise to the cause of action. The duty to defend as established by this method will be coextensive with the duty to indemnify. In every case in which an insurer (or insurers) has coverage and there is a possibility that because of the allegations of a complaint it may be called upon to indemnify Forty-Eight, it also has a duty to defend or share in the costs of defense. These costs, if originally borne by one insurer, should be apportioned among all insurers under a duty to defend by the number of years of exposure for which each insurer provided coverage.

Since Forty-Eight is to be considered self-insured prior to 1955 and may well be uninsured in the future, it will also be obligated to bear such defense costs in direct proportion to the other insurers as stated above. It would be anomalous to hold that Forty-Eight is liable for a portion of a judgment because part of the alleged injury occurred when it had no coverage but allow it to avoid the costs of defending the suit for that period. As mentioned, *supra*, the policies involved are not "claims made" policies that provide coverage and defense only if a claim is brought within the policy period, but rather "occurrence" policies that provide coverage and defense for injuries that occur within the policy period. Since a portion of the injury is allocated to the period for which Forty-Eight is considered self-insured, it must be treated as an insurer, and a portion of the defense costs must be allocated to that period.[8]

---

8. The following hypothetical case illustrates this apportionment. Assume that Forty-Eight has coverage for asbestos-caused injuries through 1979, but not thereafter. Assume further that a lawsuit is brought in 1986 and that the plaintiff alleges exposure to asbestos dust from January 1, 1965 to December 1, 1984. Forty-Eight must assume the defense and ultimately pay $^5/_{20}$ths of the cost of the defense.

Since notice pleading was adopted, it has been held that an insurer has a duty to defend even if there is a doubt whether a complaint against an insured comes within the coverage of a policy. This duty to defend continues "until such time as the claim against the insured is confined to a recovery that the policy did not cover." *Carboline Co. v. Home Indemnity Co.*, 522 F.2d 363 (7th Cir. 1975) (applying Illinois law and citing numerous cases). Many of the underlying complaints allege general dates of exposure, and since exposure determines coverage, such an allegation is sufficient to trigger the duty to defend. *Burger v. Continental Nat. Am. Group*, 441 F.2d 1293 (6th Cir. 1971). If more than one insurer was on the risk during the alleged periods of exposure, they will be jointly and severally obligated to assume the defense. In those cases where no specific dates of exposure are alleged, the insurer providing coverage on the date the suit is filed must undertake the defense.[9] This duty, likewise, will fall upon Forty-Eight for suits that are brought in a period in which it has no coverage. In these suits as well as in instances where, because of exposure prior to 1955 it could ultimately be liable for a substantial part of the judgment, Forty-Eight may want to assume control of the defense in any event. If it does, it will be entitled to be reimbursed for such part of the costs of that defense by any insurer who would be obligated to pay part of a judgment.

This opinion constitutes the required findings of fact and conclusions of law.

An appropriate order has been entered.

---

**9.** If pretrial discovery uncovers specific dates of exposure which indicate that the current insurer cannot be held liable to indemnify Forty-Eight, that insurer may tender the defense to the insurer (or insurers) who could be held liable. An insurer faced with such a tender either from the current insurer or from its insured must assume the defense or make arrangements for sharing the cost of the defense. *See, Liberty Home Improvement v. Royal Globe Ins. Co.*, CCH Auto Cas. 17, 682 (¶ 9394) (Tenn.App.1977). Due regard must be given to possible conflicts of interest.

When the duty to defend arises as a question between insurers it is proper to go outside the complaint to make this determination. This is particularly so because of notice pleading. Long, Law of Liability Insurance § 502 (1976); *see also, Hartford Acc. & Indemnity Co. v. Allstate Ins. Co.*, 5 Ohio App.2d 287, 215 N.E.2d 416 (1966). Once it has been established by the investigation of the current insurer that the dates of exposure place the duty to defend on a prior insurer, the current insurer is entitled to be reimbursed for the costs of defense it has incurred.

This court notes that a pragmatic approach would be to seek a determination of underlying liability before any attempt is made to fix the duty to defend.