CENTURY BOAT COMPANY, Plaintiff and Counter-Defendant,

v.

MIDLAND INSURANCE CO. and Johnson & Higgins of Illinois, Inc., Defendant and Counter-Plaintiff.

No. G82–663 CA7.

United States District Court, W.D. Michigan, S.D.

Feb. 25, 1985.

---

Douglas E. Wagner, Warner, Norcross & Judd, Grand Rapids, Mich., for plaintiff and counter-defendant.

Alvin D. Treado, Culver, Lague & McNally, Muskegon, Mich., for Midland Ins. Co.

David O. Haughey, Smith, Haughey, Rice & Roegge, Grand Rapids, Mich., for Johnson & Higgins.

## OPINION

HILLMAN, District Judge.

This case involves a dispute concerning the interpretation and application of an insurance policy, specifically whether certain defense costs incurred by the insured are covered by the disputed policy. It was tried to the court from August 28–30, 1984, with closing arguments on November 9, 1984. This opinion constitutes the court's finding of facts and conclusions of law as required by Fed.R.Civ.P. 52.

### FINDINGS OF FACT

Plaintiff, Century Boat Company ("Century"), is a Michigan corporation, located in Manistee County, Michigan, which manufactures and markets a line of power boats. Defendant, Johnson & Higgins of Illinois, Inc. ("Johnson & Higgins"), is an insurance broker. Its general business involves advising insureds and potential insureds on insurance matters, arranging insurance programs or risk management programs on behalf of insureds or self-insureds, and acting in an intermediary capacity between insureds and insurance companies. Defendant, Midland Insurance Company ("Midland"), is a Delaware insurance company engaged generally in casualty insurance business. At all pertinent times, Midland maintained an agency agreement with Capacity Managers, Inc. ("CMI"), to underwrite and issue on its behalf various types of insurance contracts, including the class of insurance contract involved in this case.

Prior to August 31, 1978, Century had purchased product liability insurance from various insurance companies. These policies were of a standard form, without any deductible or self-insured retention, requiring the insurance company to pay all defense costs, as well as the entire amount of every claim subject to a stated limit of liability. Also, the insurance company had substantial control over investigation and management of claims, settlement of claims, selection of counsel, and management of the defense of litigated claims. In August of 1978, Century decided to investigate other product liability programs which would: (1) substantially reduce its insurance premiums; (2) give Century a right to greater participation in claims investigation, settlement, selection of counsel, and

management of litigation; and (3) provide for self-insurance up to reasonable levels of risk. Century also considered a total self-insurance program. In order to pursue those objectives, Century contacted Johnson & Higgins for advice on a product liability program and for assistance in putting a satisfactory program into place. After preliminary discussions between Century and Johnson & Higgins, it was decided that the idea of total self-insurance would not be pursued, but that Johnson & Higgins would attempt to find a suitable product liability program for Century, which would meet its other above-stated objectives.

In the later part of 1978 and early 1979, Johnson & Higgins did considerable work in connection with Century's requirements, including surveys of Century's operations and products, preparation of detailed underwriting presentations, and negotiations with a number of potential insurers. This work culminated in three specific written proposals for insurance which were presented to Allan Hegg, the president of Century Boat Company, at a meeting in Chicago on January 5, 1979. All three proposals were presented by Johnson & Higgins as being suitable, but of the three, a proposal represented as that of Midland was recommended as the best. All three were based on coverage to start February 15, 1979, which was the date of the expiration of Century's then existing coverage. All three proposals, through the same hypothetical examples, indicated that defense costs were included in the self-insured retention or deductible.[1] All three had a self-insured retention of $100,000 per occurrence.

On January 30, 1979, Leonard Holmes, the Century officer primarily responsible for its insurance program, telephoned Rick Voss, the officer of Johnson & Higgins who was managing the Century account. Holmes advised Voss that Century was rejecting all three of the written proposals submitted January 5th, and had tentatively decided to accept an insurance proposal presented to them by another insurance broker, Alexander & Alexander. However, Holmes advised Voss that Century would delay acceptance of the Alexander & Alexander offer until at least February 1, to allow Johnson & Higgins the opportunity to make a new proposal which would equal or improve upon the Alexander & Alexander proposal. A deadline of February 1, 1979, was set for any new proposal to be made by Johnson & Higgins. A primary reason that Century was rejecting the January 5 proposal of Johnson & Higgins was Century's decision, based on its size and financial situation, that a self-insured retention of $100,000 per occurrence was an unacceptable level of retained risk.

Voss telephoned CMI, general agent for Midland, and obtained oral authorization to make a new proposal to Century. The new proposal was made over the telephone by Voss to Holmes of Century on February 1, 1979. The terms of this proposal regarding the handling of defense costs are disputed between Century and Johnson & Higgins. In all other respects, the parties are in agreement as to the terms of that proposal. Neither party has been able to present a contemporary written memorandum of the terms agreed upon. Nevertheless, both agree that the proposal was for a policy to be issued by Midland, to run for one year, from February 15, 1979, to February 15, 1980, covering product liability and completed operations, with a combined aggregate bodily injury and property damage coverage of $3 million. To this extent, the new proposal was the same as the written proposal of January 5, 1979. The premium was changed from a rate of $5 per $1,000 of sales and a minimum premium of $150,000 to a rate of $37.80 per unit manufactured and a minimum premium of $170,000. The self-insured retention was changed from $100,000 each occurrence

---

**1.** The Midland proposal stated: "Defense costs will be included in the SIR [self-insured retention] and in the limits of liability. Thus, a $200,000 loss, $100,000 of which is for defense costs, would be divided evenly between Century and Midland. Claim investigation and reserving would be the responsibility of Century Boat Company."

and $500,000 aggregate to $50,000 each occurrence and $500,000 aggregate. As noted, in the earlier Johnson & Higgins' proposal of January 5th, defense costs were represented as being included as part of the self-insured retention. Coverage of defense costs in the telephoned proposal of February 1st is in dispute. Century claims that the feature was unchanged, while Johnson & Higgins claims that the February 1st proposal provided for a division of defense costs between the insurance company and the insured in proportion to the amount ultimately paid by each on a claim, and that counsel would be hired by the insured. It is undisputed, in any event, that claim investigation and management would be primarily the responsibility of Century through retention of a claims management agency to be approved by Midland.

Regarding the factual dispute outlined in the preceding paragraph, the court finds that Century understood the proposal of February 1, 1979, to provide for the inclusion of defense costs in the self-insured retention as contained in the January 5 proposal. Although the court is satisfied that Voss believed he had explained the changes [2] in the proposed insurance program to Century, the following factors convince me that any attempted explanation by Voss was not successful. First, Holmes made a comparison chart of the programs receiving consideration following the February 1, 1979, telephone call. The chart compared Century's current insurance program, the Johnson & Higgins proposal, and the Alexander & Alexander proposal. It demonstrated that Holmes understood each program as having a "deductible," which included defense costs. Second, at least one reason Century had rejected Johnson & Higgins' earlier proposals was because it thought it could not handle a deductible risk of $100,000 per occurrence. Yet, the pro rata sharing of defense costs, which defendants maintain was provided for in the February 1, 1979, proposal, exposed Century to a greater potential risk than $100,000 per occurrence. Third, I find Holmes' testimony on this point credible. Finally, evidence at trial demonstrated that Voss' telephone call to Holmes on February 1, 1979, to present the new proposal, lasted only five minutes. Explanation of a complicated insurance program, which included a major change in coverage from the prior proposals, to a non-expert in a five-minute telephone call must have been superficial at best.

On February 5, 1979, the February 1 proposal was accepted by Century by a telephone call to Johnson & Higgins, without any further discussion of its terms. An insurance binder was prepared by Johnson & Higgins on February 7, was signed by Midland on February 9, and sent to Century with a letter dated February 12, 1979. The binder set forth the principal features of the insurance policy but was silent regarding defense costs. On March 3, 1979, the insurance policy, which by that time had been issued by Midland, was sent by Voss of Johnson & Higgins to Holmes of Century with a letter dated March 6, 1979. The letter stated in substance that the policy, as issued, had been reviewed by Voss and conformed to the parties' negotiations. This letter mentioned no change in the way defense costs would be allocated. The premium was paid.

The Midland policy, as delivered to Century, included all the terms and conditions of the policy, including an attachment identified as "ENDORSEMENT NO. 2," which purports to deal, among other things, with defense costs. Holmes of Century, received the policy and read it, including those portions which were not part of the printed form, e.g., Endorsement No. 2. At the time of his review, he concluded that the policy did in fact conform to his understanding of the bargain that had been struck. The policy was then filed away

---

**2.** Voss testified at trial that at the time Midland authorized him to make the new proposal to Century, he understood that defense costs were to be apportioned between the insurer and the insured. Further, Voss understood the proposal as covering no defense costs until the insured expended its self-insured retention on a settlement or judgment.

and was not examined again by anyone until the spring of 1982, shortly before the filing of this suit. The disagreement concerning the terms of the policy coverage became apparent only when a claim arose under the policy.

On September 3, 1979, a person named Davidow was injured in Pennsylvania while riding as a passenger in a Century boat. An action was commenced by her in the State of Pennsylvania, and Century was served with the complaint on January 28, 1980. Mrs. Davidow claimed that her injuries (she was rendered quadraplegic) were caused by a defect in the Century boat in which she was riding at the time it collided with another boat. This claim (hereinafter "the Davidow case") fell within the coverage provided by Midland's policy. A wholly-owned subsidiary of Midland, All Risk Management Service ("ARMS"), with which Century had contracted for claims management, handled the Davidow claim. ARMS, on the recommendation of Century's local counsel, selected a Pittsburg lawyer to defend the case. Pittsburg counsel, Harry Zimmer ("Zimmer"), kept Century, Midland and ARMS advised of the progress of the litigation.

In early spring of 1982, the Davidow case was approaching trial. Century had thus far paid all defense costs under the assumption it had a $50,000 cap. It was determined by Attorney Zimmer that an outside engineering expert should be retained and that certain experiments should be commissioned in preparation for trial. The estimated cost of these tests was approximately $60,000. Century, through ARMS, asked Midland to approve the hiring of the expert (Miller) and the commissioning of the experiments and to pay all defense costs once they exceeded $50,000. This demand for payment of defense costs was refused by Midland, which took the position that the payment of defense costs was entirely the responsibility of Century until such time (if at all) as a claim was paid by way of settlement or judgment. It was Midland's position that the first $50,000 of any such payment was the obligation of Century. At that time, Midland would reimburse Century for defense costs incurred by Century in proportion to the amount paid by each on the Davidow claim. However, despite the dispute regarding payment, Midland approved the retention of Dr. Miller, an engineer, and the performance of certain accident reconstruction tests in March, 1983. Century paid the costs of Dr. Miller's retention under a reservation of rights.

Century's insurance policy provided in Endorsement No. 2, that Midland had the right, but not the duty, to defend or participate in the defense of any claim made against its insured. I find that Midland began to actively participate in the defense of the Davidow case at least by March 10, 1983, when it approved the retention of Dr. Miller, which retention all parties agreed proved indispensable in Century's defense of the Davidow claim. Marsh, the ARMS agent handling the Davidow claim, testified that the ultimate decision regarding the retention of Dr. Miller, and the performance of the tests was Midland's. In April of 1982, Attorney Zimmer was told by Marsh to begin contacting Midland personnel directly. Zimmer then had direct contact with and accepted guidance from Midland at least on settlement matters. Both Zimmer's and Marsh's invoices demonstrate the substantial participation Midland took in the defense of the Davidow case.

Another dispute arose just prior to the trial of the action, when pre-trial settlement conferences were being held. When Attorney Zimmer indicated to Marsh of ARMS that he needed settlement authority for the pre-trial, Marsh informed Midland of the status of the case. In light of the upcoming settlement discussions, Midland demanded that Century be prepared to tender its $50,000 under the SIR so a settlement proposal could be made. Century contested its obligation to contribute to any settlement because in its view it had already expended the entire SIR, or deductible, toward defense of the Davidow claim. Eventually, Century agreed to tender the $50,000 if a settlement could be reached.

While settlement was being discussed, just prior to and during the trial, the parties (Davidow and Century) were never closer than $500,000 to settling the claim. Attorney Zimmer stated that he never recommended more than $300,000 as Century's contribution to settlement in the *Davidow* action, although at one time, according to Midland's records, Midland authorized an offer as high as $500,000 if the matter could be settled. Century, however, thought a settlement offer in excess of $500,000 was necessary to protect its interest and urged that one be tendered. Apparently due to the lack of contribution by other defendants, settlement was never reached.

At the conclusion of a trial in Pennsylvania, a jury verdict was returned in favor of Century. Other defendants were also released from the case, but a substantial verdict was rendered for Mrs. Davidow against her husband, the operator of the boat. Because no settlement or judgment was rendered against Century, Midland has taken the position that it is not obligated to contribute to the defense costs under the terms of Endorsement No. 2 of Century's policy. Since there was no loss by way of judgment or settlement against the insured (Century), Midland claims there is no basis for apportioning any defense costs to Midland. Century claims that this interpretation by Midland constitutes a breach of contract, bad faith and unfair dealings. Century claims it is entitled to $62,930.02 in compensatory damages, this amount having been paid in excess of $50,000 toward defense costs in the *Davidow* case. Century also requests declaratory relief that Midland and/or Johnson and Higgins are responsible for all post-trial defense costs in the *Davidow* case, which is currently on appeal. Century further requests assessment against Midland of punitive damages and, finally, penalty interest and attorney fees pursuant to statute.

Century's theory of the case is one of the following two factual scenarios: (1) If the policy provides the coverage for defense costs that Johnson & Higgins allegedly told Century it provided, then Midland is responsible for all defense costs in excess of $50,000; or (2) if the policy does not provide that coverage, Century claims Johnson & Higgins misrepresented the terms of the policy and must compensate Century for the damages it suffered as a result of Johnson & Higgins' misrepresentation.

Johnson & Higgins asserts two different defenses to Century's claim. First, Johnson & Higgins maintains that it fully informed Century of Midland's interpretation that defense costs would be apportioned and then only in the event of a settlement or a judgment and, therefore, was not guilty of any negligence in the brokerage services it provided Century. In the alternative, Johnson & Higgins claims that the policy itself is ambiguous and should be construed in favor of the insured (Century) to include defense costs in the $50,000 self-insured retention. Johnson & Higgins thus contends that, under that construction, the policy provides for Century the coverage it claims it bargained for and, therefore, Century has suffered no damage by reason of Johnson & Higgins' conduct.

Midland responds that any deviation between the written terms of the insurance policy and the coverage Century now claims it bargained for is the result of negligence on the part of Johnson & Higgins. Consequently, Midland has filed a cross-complaint against Johnson & Higgins for contribution or indemnification in the event Midland is found liable for any damages claimed by Century.

## CONCLUSIONS OF LAW

I find Midland and Johnson & Higgins jointly liable for all past and future defense costs in excess of $50,000 incurred by Century in the *Davidow* case. I find Midland's insurance contract ambiguous. Further, I find Johnson & Higgins was negligent in its communication to Century of the terms of the contract. Both contributed equally to Century's obtaining a policy which did not contain the coverage for which Century believed it had bargained and paid.

### Ambiguity of the Midland Contract

While I am persuaded that Century's insurance contract with Midland provides for proportionate sharing of defense costs in some circumstances, I find the precise definition of those circumstances illusive, to say the least. Initially, I note that the court has spent literally hours both listening to oral presentations, and reviewing written briefs containing plausible and conflicting interpretations of how the policy operates with respect to Endorsement No. 2, which purports to address apportionment of defense costs. Moreover, the witness for Johnson & Higgins, an experienced insurance broker, testified in court it wasn't clear to him what the language meant. If an insurance company foists on the public an insurance policy, which experienced insurance salesmen and trained lawyers cannot fathom after reading, re-reading, and studying, then it seems only good sense and sound public policy that the insurance company must bear the risk of an unfavorable interpretation.

■ Requiring the insurance company to bear this risk when it issues an ambiguous policy is amply supported by applicable case law. In this diversity action, Michigan's conflict of law rules apply. *Insurance Co. of North America v. Forty-eight Insulations, Inc.*, 633 F.2d 1212, 1219 (6th Cir.1980), *cert. denied*, 454 U.S. 1075, 102 S.Ct. 626, 70 L.Ed. 609. Michigan's conflict of law rules require that construction of a contract be governed by the law of the state in which the last act necessary to make the contract a binding agreement occurs. *State of Ohio v. Eubank*, 295 Mich. 230, 233–234, 294 N.W. 166 (1940); *Insurance Co. of North America*, 633 F.2d at 1219. The last act necessary to make an insurance contract a binding agreement is the counter-signature of the insurer. *Chrysler Corp. v. Insurance Co. of North America*, 328 F.Supp. 445, 449 (E.D.Mich. 1971). The insurance contract involved in this action was counter-signed in Chicago, Illinois, in February of 1979. Thus, its interpretation is governed by Illinois law.

■ It is well settled in Illinois that any ambiguity in an insurance policy is construed against the insurer and in favor of the insured. *Kirk v. Financial Life Ins. Co.*, 75 Ill.2d 367, 27 Ill.Dec. 332, 389 N.E.2d 144 (1978); *State Farm Fire & Casualty Co. v. Moore*, 103 Ill.App.3d 250, 58 Ill.Dec. 609, 430 N.E.2d 641 (1981). Midland's refusal to pay is based on a limitation clause inserted in the policy, namely Endorsement No. 2. When such an attempt is made, the limitation is always construed in favor of the insured. As stated by the Illinois Supreme Court:

> "[W]hen an insurer attempts to limit its liability under the ... policy, such limitation must be construed liberally in favor of the policy holder, and most strongly against the insurer."

*Squire v. Economy Fire & Casualty Co.*, 69 Ill.2d 167, 13 Ill.Dec. 17, 22, 370 N.E.2d 1044, 1049 (1977).

This rule was further explained in *State Farm Fire & Casualty Co. v. Moore*, 58 Ill.Dec. at 614, 430 N.E.2d at 646:

> "Where an insurer attempts to limit liability, the insurer must show that the claim falls within the exclusion as the insured's intent was to obtain coverage [citation omitted].... [F]urther, the insurer, as the drafter of the policy, could have stated exclusions clearly and specifically. [Citation omitted] Exclusionary provisions, therefore, are applied only where the terms are clear, definite and explicit."

*Accord, see State Farm Mutual Automobile Ins. Co. v. Schmitt*, 94 Ill.App.3d 1062, 50 Ill.Dec. 493, 494, 419 N.E.2d 601, 602 (1981); *Barnes v. Powell*, 49 Ill.2d 449, 454, 275 N.E.2d 377 (1971);

■ In determining if an ambiguity exists, the court should consider the subject matter of the contract, the facts surrounding its execution, the situation of the parties, and the predominant purpose of the contract, which is to indemnify the insured. *Dora Township v. Indiana Ins. Co.*, 78 Ill.2d 376, 36 Ill.Dec. 341, 400 N.E.2d 921 (1980). Moreover, as stated by the court in *Garman v. New York Life Ins. Co.*, 501

F.Supp. 51, 53 (N.D.Ill.1980), "a literal interpretation of one provision should be avoided if such interpretation leads to unreasonable or absurd results."

The court finds it was at all times the intention of Century to obtain coverage for all defense costs once the $50,000 limit was reached. This was communicated to Johnson & Higgins and should have been relayed by Johnson & Higgins to Midland when Johnson & Higgins solicited a proposal from Midland. It was Johnson & Higgins' duty to know and understand Century's insurance needs; to communicate them accurately to Midland; to understand Midland's latest offer to Century; and, finally, to explain the proposal carefully and accurately to Century. If it failed in this responsibility, as this court finds it did, such failure constituted negligence, as hereafter explained.

Midland now asserts that because Century successfully defended the *Davidow* case, it is not entitled to reimbursement for any of the expenses it incurred in that defense. Although Century admittedly wanted greater participation in the defense of claims, I am satisfied from the evidence that it was never Century's intention to bear total responsibility for that defense. As discussed, Midland clearly participated in defending the *Davidow* case. Based on the above, I am satisfied that Century should be provided the coverage it thought it had obtained.

■ As indicated above, Illinois courts nearly always find in favor of the insured when there is ambiguity as to the excluding or limiting provision of the contract. Any time a provision is subject to more than one reasonable interpretation, it is ambiguous. *See, e.g., State Farm Fire & Casualty Co.*, 58 Ill.Dec. at 614, 430 N.E.2d at 646. Thus, even if this court finds that Century's interpretation of the language found in Midland's policy is not the only reasonable interpretation, the language of Endorsement No. 2 is, at the very least, ambiguous and must be construed against Midland.[3]

■ I find the policy issued to Century by Midland, when read as a whole, ambiguous with respect to payment of defense costs, in the following respects. As stated earlier, when Century received the policy issued by Midland, it understood that the coverage included attorney fees and that the deductible was $50,000. Century had been lead to believe by Johnson & Higgins, and the policy seems to state, that once $50,000 was paid by Century toward the defense of a claim, it became Midland's obligation to pay all remaining defense costs.

For example, the printed portion of the policy contains a section under the heading, "Supplementary Payments," which provides as follows:

> "The company will pay, in addition to the applicable limits of liability: (a) All expenses incurred by the company, all costs taxed against the insured in any suit defended by the company and all interest on the entire amount of any judgment therein which accrued after the entry of judgment and before the company has paid or tendered or deposited in court that part of the judgment which does not exceed the limit of the company's liability thereon; (b) * * *; (c) * * *; (d) Reasonable expenses incurred by the insured at the company's request assisting the company in the investigation or defense of any claim or suit including actual loss of earnings not to exceed $25 per day."

The policy also provides under Coverage A Bodily Injury Liability and Coverage B Property Damage Liability that:

> "The company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage,

---

**3.** The duty of an insurer to clearly express the limitations of its policy is also the law in Michigan. *See, e.g., Ornamental Iron and Stair Company v. General Accident and Life Association Corporation, Ltd.*, 68 Mich.App. 259, 242 N.W.2d 544 (1976); *Union Investment Company v. Fidelity & Deposit Co. of Maryland*, 549 F.2d 1107, 1110 (6th Cir.1977). Thus, even if Michigan law were to apply, the provision must be construed against Midland.

even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by the payment of judgment or settlement."

From the foregoing provisions of the printed portions of the policy, it is clear that the insurance company has the right and duty to defend any suit against the insured and this is an obligation over and above its obligation to pay valid claims or judgments against the insured.

This obligation is reinforced by the provisions of the section on supplementary payments, which requires the company to pay all expenses incurred by the company, and also reasonable expenses incurred by the insured at the company's request. Midland claims that the attorneys defending the *Davidow* suit were hired by Century, that the experts were hired by Century, and that all defense costs were incurred by Century. But, under Coverages A and B, above quoted, Midland had the "right and duty to defend any suit against the insured seeking damages on account of such bodily injury." The *Davidow* case was certainly a suit against the insured seeking damages for bodily injury alleged to have arisen out of hazards (product liability) specifically covered by the policy. Therefore, the obligation for these costs was the obligation of Midland unless there is some other provision of the policy which must be deemed to modify the quoted sections. The only items in the policy which could be construed to modify the above-quoted portions of the printed section of the policy are Endorsements 1, 2 and 3.

Endorsement 1 is entitled, "Single Limit of Liability," and provides, in Section 1,

that the company's limit of liability for bodily injury and property damage is $3 million "excess of a $50,000 each occurrence—$500,000 aggregate self-insured retention." This endorsement supports Century's interpretation of its policy with Midland.

Midland relies on Endorsement 2 of the policy to avoid payment of defense costs in excess of $50,000 in the particular circumstances of this case. However, the first paragraph of the Endorsement says, in pertinent part:

"It is agreed that, *notwithstanding anything herein to the contrary* ... no coverage shall apply unless or until any *loss* shall exceed $50,000..."

The word "loss" is not defined in the policy, but Century understood it to include defense costs. Indeed, Johnson & Higgins' written explanation of Midland's first quote used the word "loss" to include defense costs.

The second paragraph of Endorsement 2 contradicts the language in the body of the policy by giving Midland "the right, but not the duty, to defend or participate in the defense, at its option, of any claim made against the Insured." The policy does not explain, nor define, what constitutes "participation" in the defense of a claim. Nor does it say what happens if that option is exercised. One reasonable interpretation is that the language in the body of the policy then controls and that Midland must assume the obligation to pay defense costs. By the time Dr. Miller's reconstruction accident tests were approved by Midland, the point at which Century's defense costs began to exceed $50,000, Midland was at least participating in the defense of the *Davidow* claim, if not controlling it.

The final paragraph of Endorsement 2 contains the language upon which Midland's refusal to pay is based.[4] Midland

4. That paragraph provides:
"It is further agreed that the Company shall not be obligated to bear any expense incurred in the investigation, settlement or defense of any suit, unless or until the amount paid as respects any one occurrence or in the aggregate shall exceed the Insured's $50,000 each occurrence of $500,000 in the aggregate retention, and then the Company's obligation shall be for only the porportion [sic] of total costs as the Company's payment to effect settlement shall bear to the total amount of such pay-

482

claims that clause limits application of the deductible in the context of defense costs. The first part of the paragraph is totally consistent with Century's claim in this case. It provides that Midland shall be obligated to pay expenses incurred in the "investigation, settlement or defense of any suit when those expenses exceed the $50,000 deductible." However, the final phrase of the endorsement apparently attempts to reduce Midland's obligation to pay defense costs in the event of settlement.

The application of this final paragraph of Endorsement 2 to the circumstances of this case is ambiguous in several respects. First, it is not clear whether it controls over the first paragraph of Endorsement 2 providing that "notwithstanding anything herein to the contrary" coverage applies once the insured's "loss" exceeds $50,000 per occurrence. Neither is it clear whether the proportional sharing of defense costs applies where, as here, a claim goes to trial with the insured obtaining a favorable verdict, or whether it applies only when a pre-trial settlement is reached. Finally, it is not clear whether the attempted limitation on Midland's obligation to pay defense costs exceeding the $50,000 self-insured retention applies when Midland participates in the defense of a claim, as it did in the *Davidow* case. Because the answers to these questions are not clear when the policy is considered as a whole, the attempted limitation must be construed in favor of the insured, and in favor of coverage. The insured read the policy and believed defense costs were included in its $50,000 self-insured retention. Given the ambiguity of Endorsement 2 and its conflict with other policy provisions, I find this entirely reasonable, particularly in light of the insured's prior negotiations with Johnson & Higgins.

*Johnson & Higgins' Joint Liability*

■ Johnson & Higgins agreed to negotiate and procure a product liability insurance policy acceptable to Century. By undertaking this task, Johnson & Higgins owed a duty to Century to "exercise reasonable skill, care and diligence" in procuring a policy. 16 Appleman "Insurance Law and Practice" § 8841, p. 171. When an insurance broker or agent undertakes to procure an insurance policy for an insured, an action in tort will lie for breach of the duty to exercise due care in performance of the undertaking. *Clark v. Dalman*, 379 Mich. 251, 261, 150 N.W.2d 755 (1967); *see also Stein v. Continental Casualty*, 110 Mich.App. 410, 417, 313 N.W.2d 299 (1981) (where a special relationship exists between insurance agent and insured, there is a duty to advise of adequacy of coverage); 14 Callaghan's *Michigan Civil Jurisprudence, Insurance*, § 82, p. 101.

■ Despite the ambiguous language of the Midland insurance policy, the uncontroverted testimony of Johnson & Higgins' agent Voss was that he understood that Midland's intent was that defense costs would be apportioned between Century and Midland in proportion to the amount contributed by Century and Midland to any settlement or judgment paid to a third party under the policy. In short, Voss testified that he understood the proposal exactly as Midland now claims it was made. This intended limitation on coverage with respect to defense costs was a significant departure from Johnson & Higgins' representation of Midland's earlier proposal in January of 1979. It was likewise a significant departure from prior negotiations between Century and Johnson & Higgins, and was markedly different from the Alexander & Alexander proposal which was also receiving serious consideration by Century.

Johnson & Higgins failed to effectively ·bring home these differences. Voss, Johnson & Higgins' agent, admitted at trial that it would have been "good practice" to explain to Century in writing the change which he had thought he had communicated to Holmes of Century in a five minute telephone conversation on February 1, 1979. This failure to follow "good prac-

ment, inclusive of the Named Insured's reten-

tion."

tice" was particularly important in the instant case because Century had earlier balked at accepting Johnson & Higgins' Midland proposal with a $100,000 deductible, on the grounds that Century was concerned it could not handle that high a per-occurrence exposure. As is illustrated by this case, the potential per-occurrence exposure under the February 1, 1979, Midland proposal, as Johnson & Higgins admits it understood its terms, potentially exceeded $100,000. Finally, Johnson & Higgins again failed to clarify the operation of the Midland policy's SIR after reading it, when it forwarded the policy to Century. Instead it stated that the policy conformed to Century's "negotiations" with Johnson & Higgins. This lack of clarification demonstrates an absence of due care, particularly in light of the fact that Johnson & Higgins now concedes that the meaning of the language of the Midland policy is ambiguous, at best, and/or contrary to Johnson & Higgins' own understanding of its terms at the time the policy was issued.

 A broker, who was negligent in obtaining a policy of insurance, is liable for any damages proximately caused by his negligence, up to the amount of the insurance he was employed to procure. *Cf. Stein v. Continental Casualty*, 110 Mich. App. at 417, 313 N.W.2d 299. (The negligent agent in *Stein* was unquestionably the agent of the insurer. The rationale of that case, however, applies with equal force when an independent broker acts in a dual-agency capacity.)

 Yet I do not find Johnson & Higgins solely responsible for Century's failing to get the coverage it thought it had paid for since the ambiguity of Midland's contract was an equally contributing factor. There were two distinct points at which the limitations on coverage, which Midland claims it provided, and Johnson & Higgins concedes it understood, could have been made clear to Century. Johnson & Higgins, as Century's agent, could have made certain that Century understood any limitations on coverage. Additionally, however, Midland also could have avoided this dispute by drafting a policy in clear and unambiguous language. Holmes, of Century, read the Midland policy. Had the policy language been clear, Century would have understood the alleged limitation and the policy could have been renegotiated to provide the coverage desired by Century, or Century could have looked for coverage elsewhere. Accordingly, I find Johnson & Higgins and Midland equally responsible for this dispute. Under Michigan law, concurrent negligent acts of two parties render them jointly liable if their acts are the proximate cause of a single injury or wrong. *Solis v. Norfolk & W. Ry. Co.*, 352 F.Supp. 209 (E.D.Mich.1972).

## Century's Claim for Punitive Damages, Penalty Interest and/or Costs and Attorney Fees

 Century also claims entitlement to punitive damages against Midland. Under Illinois law, "[W]here a plaintiff demonstrates that the insurer's conduct was outrageous, malicious and/or threatening" punitive damages are available. *Kelly v. Stratton*, 552 F.Supp. 641, 643 (N.D.Ill. 1982).

 Century also claims that it is entitled to 12% penalty interest under the Michigan Uniform Trade Practices Act, M.C. L.A. § 500.2001, et seq.; M.S.A. § 24.1200, *et seq.* Interest under that Act will not be awarded unless the liability of the insurer for the claim is not reasonably in dispute and the insurer's refusal to pay was in bad faith. *Medley v. Canady*, 126 Mich.App. 739, 743, 337 N.W.2d 909 (1983).

Similarly, Century contends that Midland is liable for a penalty award and Century's attorney fees and costs pursuant to the Illinois Insurance Code of 1935, specifically, § 155 Ill.Rev.Stat.1973, ch. 73 para. 767. Section 155 provides for attorney fees, costs and a penalty if an insurance company unreasonably and vexatiously refuses to settle a claim or delays in such settlement.

 I do not find Century entitled to any of these items of damages, because I am not persuaded that Midland's dispute concerning the terms of coverage was un-

**484**

reasonable. Nor do I find that Midland was guilty of bad faith in its assertion of its own interpretation of Century's coverage. To find that insurance policy language is ambiguous is not the equivalent of finding one interpretation of that language unreasonable. This is particularly true when, as is true here, the insurer's interpretation of the disputed language is initially supported by a reputable insurance broker acting on behalf of the insured.

Further, I do not find that Midland's insistence that Century tender its $50,000 self-insured retention toward a settlement package, lest Century otherwise jeopardize its coverage, sufficient to rise to a level of bad faith or threatening conduct. I am convinced that when Midland made the demand, it believed it had every right to do so. Additionally, Midland has entered into agreement with the plaintiff and a co-defendant in the *Davidow* case, which protects Century from a verdict in excess of its policy limits should the *Davidow* case be retried.

### CONCLUSION

For the reasons stated herein, Century is entitled to recover $62,930.02, plus judgment interest provided by law, from Johnson & Higgins and Midland. Further, Johnson & Higgins and Midland are jointly liable for all post-trial defense costs incurred in the *Davidow* case.